IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ISIDRO BARRAGAN,<br><br>    Defendant. | No. CR13-4018-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

_____

## *Introduction*

Defendant Isidro Barragan is charged by indictment (Doc. No. 2) with conspiracy to distribute methamphetamine and possession with intent to distribute methamphetamine. He has filed a motion (Doc. No. 17) to suppress evidence obtained from a search of his hotel room and from a post-*Miranda* interview. Plaintiff (the "Government") has resisted the motion (Doc. No. 22). The Trial Management Order (Doc. No. 6) assigns motions to suppress to me to conduct any necessary evidentiary hearings and to prepare reports on, and recommended dispositions of, those motions.

I held an evidentiary hearing on July 31, 2013. Assistant United States Attorney Jack Lammers appeared on behalf of the Government. Defendant appeared personally and with his attorney, Stuart Dornan. The Government offered the testimony of John Howard with the Iowa Division of Narcotics Enforcement and Brian Clausen with the Sioux City Police Department. Government Exhibit 1, a DVD containing video of the post-*Miranda* interview conducted March 7, 2013, was admitted into evidence without objection. After the hearing, I invited the parties to submit their final arguments in writing after the hearing transcript was filed. Both parties filed briefs on August 22, 2013. (Doc. Nos. 41, 42). The motion is now fully submitted.

## Summary of Evidence

Howard testified that on March 7, 2013, at approximately 2:00 p.m., he and Clausen found Barragan working on his vehicle outside of a Sioux City hotel. They were working undercover that day and had information that Barragan was involved with drug activity. They approached Barragan and Howard struck up a conversation. After some small talk, Howard showed Barragan his credentials and identified himself and Clausen as law enforcement. Barragan said he knew they were "cops." Howard explained that they had information Barragan was involved with drug activity and they were there to follow up on that information. Barragan denied any involvement with drugs. They asked him about a recent arrest for possession of methamphetamine and a handgun. Barragan confirmed the arrest had happened but said it was a big misunderstanding.

Howard and Clausen then asked Barragan if he had any illegal drugs on him or in his vehicle. Barragan said he did not. Howard and Clausen asked if they could take a look in his vehicle and search his person. Barragan agreed to this. Officers Carl Ragar and Scott Hatting had been working in the area that day and came by to assist with the search of the vehicle. Clausen found $800 in Barragan's shirt pocket. Nothing of note was found in the vehicle. During this time, a woman approached the scene and Ragar went to speak to her. She told Ragar that she had used methamphetamine with Barragan earlier that day in his hotel room and that she was there to purchase methamphetamine from him. Ragar did not inform Clausen or Howard of this information until later.

Howard and Clausen continued to talk to Barragan. They asked if he was staying at the hotel, for how long, and how he was paying for it. Barragan said he had been staying at the hotel a couple months and paid for it with money he received from Social Security. Howard believed the information did not add up, as Social Security income would not have covered Barragan's living expenses, including the hotel room.

Howard asked Barragan if they could look in his room. Barragan seemed unsure and then stated that he did not have to let them in his room. Howard told him that he was correct and it was completely up to him. Clausen stated that their supervisor had asked them to follow up on information that Barragan was involved in drug activity. He assured Barragan that he would not be arrested for just having a pipe in his room. Barragan then admitted that he had a pipe. Howard asked what Barragan smoked and Barragan said methamphetamine. Howard and Clausen reassured Barragan they were not worried about the pipe and asked again if they could look in his room. Barragan said they would probably get a search warrant anyway. Howard testified they did not confirm or deny this, but asked again if they could look around his room. Barragan then said "fine," but stated that he did not want them to "mess up [his] stuff."

Barragan led the officers to his room and opened it with his key card. Once they were inside, Clausen asked Barragan where the pipe was and Barragan pointed to the nightstand. Howard asked Barragan if he could open the drawer and Barragan said he could. Howard found a methamphetamine pipe and digital scale inside. Clausen asked what the scale was for and Barragan said it was used to weigh methamphetamine. Howard then asked if they could look around the rest of the room and Barragan agreed.

Barragan watched as Howard and Clausen searched the rest of the room. He sat in a chair unconstrained. At no time did he indicate that he wanted the officers to leave, stop searching or not search a particular spot. During the search, Howard noticed that Barragan appeared particularly nervous when Clausen opened a dresser drawer. Howard testified that Barragan did not take his eyes off Clausen while he searched the drawer and his leg began bouncing. Clausen lifted up the folded jeans in the dresser drawer and found nothing. Howard later went to the drawer, removed the jeans and laid them on the bed. He unfolded the jeans and found a plastic bag containing methamphetamine. Clausen then read Barragan his *Miranda* rights.

Howard and Clausen asked Barragan if he would be willing to go to the police station to answer some questions. Barragan agreed. He was transported to the station

by Ragar in his unmarked minivan. Barragan rode in the front seat, unconstrained, and Clausen rode in the back. At the station, Barragan was taken to an interview room. He was left alone in the room for a few minutes while Clausen prepared the video recorder. Clausen and Howard then came into the room and Clausen said he had to read Barragan his *Miranda* rights again even though he read them to him earlier, at the hotel. He said this was a "formality." Clausen read the *Miranda* rights and asked Barragan if he understood. Barragan nodded. Clausen said, "I need a 'yes,' yes?" Barragan said "yes."

Clausen asked Barragan to confirm that he spoke English, noting that he assumed he did since they had been speaking in English this whole time. Barragan said he might have to ask Clausen to repeat some things, but he understood English for the most part. Barragan then answered several questions from Clausen and Howard. Clausen testified that Barragan seemed to understand their questions both during this interview and at the hotel and answered them in a relevant way. He said he did not know whether Barragan had used methamphetamine that day, but based on Barragan's answers to his questions and his training and experience, he did not suspect that Barragan was under the influence of methamphetamine. Clausen also testified that he did not know Barragan's level of education or whether English was his first language. Again, however, based on Barragan's answers to questions, Clausen did not believe Barragan had any difficulty understanding Clausen's or Howard's communications with him. Barragan never voiced any concerns during the interview and Clausen and Howard both testified that Barragan was able to follow their questions and respond appropriately.

## *Discussion*

**A.**    *Did Barragan Give Voluntary Consent To Search?*

Barragan argues he did not voluntarily consent to the search of his hotel room or a dresser drawer within the hotel room because he was under the influence of

4

methamphetamine when he was approached by Howard and Clausen. Law enforcement may conduct a search without a warrant under the Fourth Amendment if they obtain a resident's voluntary consent. *United States v. Kelley*, 594 F.3d 1010, 1013 (8th Cir. 2010). The government bears the burden of proving by a preponderance of the evidence that the consent was voluntary. *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006). A consent is voluntary if the consenting individual had "a reasonable appreciation of the nature and significance of his actions." *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007) (quoting *United States v. Rambo*, 789 F.2d 1289, 1297 (8th Cir. 1986)).

In determining whether consent was voluntary, the court examines the totality of the circumstances. *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). Relevant factors include:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

*United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010). The court should also consider the environment in which the individual's consent was obtained including:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id*. The fact that an individual is under the influence of drugs or alcohol does not mean he or she is unable to provide voluntary consent. *See United States v. Castellanos*, 518 F.3d 965, 969 (8th Cir. 2008) ("[T]he mere fact that one has taken drugs, or is

5

intoxicated, or mentally agitated, does not render consent involuntary."). In determining whether consent was voluntary, the relevant question is whether the individual had "a reasonable appreciation of the nature and significance of his actions" or whether his will had been overborne and his capacity for self-determination critically impaired. *Saenz*, 474 F.3d at 1136; *Vinton*, 631 F.3d at 482.

Here, there is no doubt Barragan consented to the search of his hotel room. He told Howard and Clausen they could look around his room as long as they did not "mess up [his] stuff." He led them to his room, opened it with his key card, walked in and allowed Howard and Clausen to follow him inside. The question is whether these actions were involuntary because of drug use. Based on the record before me, the answer is easy.

There is simply no evidence that Barragan was impaired in any way, by any substance, at the time he gave consent. The only evidence of recent drug use by Barragan was testimony from the law enforcement witnesses that a woman in the hotel parking lot stated she had used methamphetamine with Barragan earlier that day. Barragan presented no evidence concerning how much methamphetamine he had used or how much time had passed between that use and his discussion with the officers. He did not testify at the hearing, thereby providing no evidence of his state of mind and alleged level of impairment when he allowed the officers to search his room.

Howard and Clausen testified they did not know if Barragan was a methamphetamine user before they approached him the day of the arrest or whether he had used methamphetamine that day. During their initial conversation with Barragan outside the hotel, Barragan told them he had a pipe in his room that he used to smoke methamphetamine. While that information obviously indicated that Barragan was a user of methamphetamine, nothing in the record suggests that the officers had reason to believe Barragan was under the influence of methamphetamine *at that time*. Indeed, they testified that Barragan did not appear to be impaired and, instead, was able to track questions and respond appropriately.

There are no other indications in the record that Barragan's consent was involuntary. This was not his first interaction with law enforcement. He told Howard and Clausen that he knew they were "cops" and that he did not have to let them into his hotel room. He made a comment about a search warrant, thus indicating his knowledge that a warrant would be required if he did not consent, but stated a belief that the officers would be able to obtain a warrant if necessary.

There is no evidence that the officers employed threats or deceptive tactics to obtain consent. While Barragan makes much of the fact that he was asked to consent three different times before he agreed, at no time did he ever state that he would not consent. Instead, on the first two occasions he made various comments (including the comment that he did not have to let the officers into the room) but did not answer the question. Ultimately, and despite being well-aware of his right to refuse consent, Barragan provided that consent. In considering the totality of the circumstances, and the relevant factors as described above, I find that Barragan gave voluntary consent for a search of his hotel room.

## B.  *Did The Search Exceed The Scope Of Consent?*

Barragan next argues that giving consent to "look around" his hotel room is not equivalent to a consent to "search." He also argues the search of the dresser drawer where drugs were found exceeded the scope of his consent. He maintains the scope of consent was permission to "look around" his room as long as they did not "mess up [his] stuff." He points out that Howard asked permission to open a nightstand drawer containing the methamphetamine pipe, but neither officer asked for permission to open the dresser drawer where the methamphetamine was found.

"[T]he standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009) (quoting *Florida v. Jimeno*, 500

U.S. 248, 251 (1991)). In assessing the scope of consent, the court must examine the totality of the circumstances, including the language of a person's consent and his actions during the officers' search. *Id.* (citing *United States v. Starr*, 533 F.3d 985, 996 (8th Cir. 2008)). The scope of a search is generally defined by its expressed object. *See United States v. Ferrer-Montoya*, 483 F.3d 565, 568 (8th Cir. 2007) (per curiam) (finding that a search of a false compartment within a vehicle did not exceed the scope of consent to search the vehicle for drugs.).

As for Barragan's first argument, the Eighth Circuit has declined to distinguish consent to "look" from consent to "search" in several cases. *See e.g.*, *United States v. Coffmann*, 148 F.3d 952 (8th Cir. 1998) (finding that defendant's invitation to police officer to "look" around his home indicated voluntary consent to search, and searching under the defendant's bed and pillow did not exceed the scope of the consent.). The use of the word "look" or "search" had no effect on the scope of consent.

What is more telling about the scope of consent is that Howard and Clausen told Barragan they were there to follow up on information that he was involved in drug activity. This put Barragan on notice of what they intended to search for (and where) if he provided consent. *See Ferrer-Montoya*, 483 F.3d at 568 ("The scope of a search is generally defined by its expressed object, and therefore an officer may reasonably interpret a suspect's unqualified consent to search a vehicle for drugs to include consent to . . . search containers within that car which might bear drugs . . . ."). Knowing this information, the only qualification Barragan imposed on his consent was that the officers not "mess up [his] stuff."

I find that the officers' search did not exceed the scope of consent under the totality of the circumstances. Barragan knew the officers intended to look for drugs in his hotel room. A reasonable person would have understood that consent to search the hotel room was consent to search anywhere within the hotel room that might contain drugs. At no time during the search did Barragan object to the search or limit the scope of consent. Instead he sat silently, watching the officers search the room, including the

dresser drawer which was searched twice. Although it was not necessary, Howard asked Barragan for permission to open the drawer of the nightstand containing the methamphetamine pipe. By assenting, Barragan only reinforced the understanding between the officers and Barragan that they could look anywhere in the hotel room where they suspected drugs may have been kept. Howard even asked Barragan if they could continue looking around the room after the methamphetamine pipe and scale were found and Barragan reaffirmed his consent. Under the totality of the circumstances it was objectively reasonable for the officers to search the dresser drawer where the methamphetamine was found and their search did not exceed the scope of consent.

### C. Did Barragan Provide A Voluntary, Knowing And Intelligent Waiver Of His *Miranda* Rights?

Barragan contends he did not voluntarily waive his *Miranda* rights because (a) he was under the influence of methamphetamine both at the hotel and when he was questioned at the police station and (b) he was misled and intimidated into waiving his *Miranda* rights. Barragan also contends he did not knowingly and intelligently waive his *Miranda* rights because (a) English is not his primary language and (b) he was not aware that he could have said "no" when Clausen told Barragan "I need a 'yes,' yes?" after asking if he understood his rights.

Under *Miranda*, a suspect in custody must be advised as follows:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A suspect may waive these rights if the waiver is made voluntarily, knowingly and intelligently. *Id.* at 444. "[A] waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or

deception." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005). "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right." *Id.* The government "need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

### 1. *Was The Waiver Voluntary?*

"A court must evaluate all of the attendant circumstances in determining whether a waiver was voluntarily made." *United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009). Specifically, the court must examine both "the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002) (quoting *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)).

I have already found that the record contains no evidence supporting Barragan's contention that he was impaired by methamphetamine use during the relevant events. However, even if the contention is accurate, the Eighth Circuit has made it clear that "[s]leeplessness, alcohol use and drug use are relevant to our analysis, but 'intoxication and fatigue do not automatically render a confession involuntary." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quoting *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990)). In *Casal*, the defendant had recently used methamphetamine and had not slept for five days. *Casal*, 915 F.2d at 1229. Nonetheless, the court found that he had voluntarily waived his *Miranda* rights based on police testimony that he did not appear to be intoxicated and he spoke coherently. *Id.* In *United States v. Turner*, the defendant was under the influence of PCP and exhibited bizarre behavior during his interview, but the court found that he had waived his *Miranda* rights because he was cooperative, reviewed and initialed each admonition of the waiver form, agreed to answer questions, gave accurate information, and appeared intelligent enough to understand his rights. *Turner*, 157 F.3d 552, 555 (8th

Cir. 1998). The ultimate question is whether the intoxication caused the defendant's will to be overborne. *Gaddy*, 532 F.3d at 788.

Here, Barragan communicated with Howard and Clausen at the hotel, tracked their questions and responded in a way that indicated he understood. He told them he knew they were "cops" and he did not have to let them search his room. After further discussion, Barragan agreed to let them look in his room. When drugs were found, Barragan was read his *Miranda* rights and was asked if he would be willing to answer questions at the police station. Barragan agreed. At the police station, he was again read his *Miranda* rights and acknowledged that they had previously been read to him at the hotel. When he was asked if he understood, Barragan nodded and said "yes" after Clausen indicated he needed a verbal response and Barragan proceeded to answer the officers' questions.[1] Clausen testified that based on his interactions with Barragan and his training and experience, he did not suspect that Barragan was impaired.[2] Under these circumstances, there is nothing to suggest that Barragan's waiver of his *Miranda* rights was involuntary because of drug use.

Barragan's second argument deals with Clausen's conduct and whether he intimidated or misled Barragan into waiving his *Miranda* rights. Barragan contends Clausen referred to the *Miranda* rights twice as a formality and also used an intimidating tone and language in getting Barragan to waive his rights. The determinative question here "is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was

---

[1] Although he was not specifically asked if he was waiving his rights or if he would sign a waiver, Barragan's conduct was sufficient to indicate waiver. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2261 (2010) (stating that *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) made it clear that a waiver of *Miranda* rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.").

[2] I find Clausen's testimony on this issue to be credible based on my independent review of Government Exhibit 1 (the recorded interview).

overborne and his or her capacity for self-determination was critically impaired." *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998).

The evidence demonstrates Barragan waived his *Miranda* rights twice—once at the hotel and again at the police station before he was interviewed. Nothing in the evidence suggests Barragan was intimidated or misled under either situation. Clausen testified that he read Barragan his *Miranda* rights from a card he carried with him. After Barragan was read his rights at the hotel, he agreed to go to the police station to answer questions. He was not handcuffed and rode in the front seat of Officer Ragar's unmarked minivan to the police station with Officer Clausen in the back seat. At the police station, Government Exhibit 1 shows Howard and Clausen entering the room and handing Barragan a bottle of water. Officer Clausen stated that he needed to read Barragan his rights again, even though he had already done so at the hotel and Barragan had indicated he understood them then. Clausen said it was a formality. Barragan nodded. As Clausen read Barragan his *Miranda* rights, Barragan faced him. Clausen asked Barragan if he understood and Barragan nodded. Clausen then stated, "I need a 'yes,' yes?" Barragan said "yes" and proceeded to answer Clausen and Howard's questions.

Nothing about these exchanges demonstrates threats, violence or promises that could have rendered Barragan's waiver involuntary. Clausen testified that he said "I need a yes" in response to Barragan's nod to communicate that he needed a verbal "yes" from Barragan. Even if Barragan perceived Clausen's tone and language as intimidating, nothing about Barragan's demeanor or responses to Clausen's comments indicated he was intimidated to the extent his will was overborne. Indeed, Barragan had previously demonstrated that he was able to resist pressure from law enforcement when he told Clausen and Howard that he did not have to let them search his room. The fact that Clausen told Barragan that reading his rights was a "formality" also does not change the analysis. *See Syslo*, 303 F.3d at 866 (finding that *Miranda* waivers were not invalidated even if the officers had told suspects that signing the waivers was a

12

formality after they went to the police station voluntarily, were informed they would be questioned and they agreed to answer). I find that the Government has met its burden of proving that Barragan voluntarily waived his *Miranda* rights under these circumstances.

### 2. *Was The Waiver Knowing And Intelligent?*

Barragan argues his waiver was not knowing and intelligent because he has limited understanding of English as it is not his primary language. He also argues that he did not know he could say "no" when Clausen asked him if he understood his rights.

A person whose primary language is not English may still waive his rights if he has a sufficient understanding of those rights. *See United States v. Morales*, CR10-3055, 2011 WL 797330 (N.D. Iowa Feb. 14, 2011) *report and recommendation adopted*, 10-CR-3055-LRR, 2011 WL 794535 (N.D. Iowa Mar. 1, 2011) (citing Eighth Circuit cases where the court found defendants' limited English proficiency did not interfere with their ability to waive *Miranda* rights or provide consent to search).

Throughout the entire exchange, Barragan communicated with Howard and Clausen in English. This is also evident in Government Exhibit 1. He was asked questions in English and responded in English. When he was read his *Miranda* rights a second time at the police station, Barragan acknowledged that Clausen had previously read them to him at the hotel. When Clausen confirmed that Barragan spoke English before the interview, Barragan stated that he did for the most part, but might need Clausen to repeat things if he did not understand. Clausen said Barragan tracked every question and responded in a way that indicated he understood throughout the entire interview.[3] The only time they had trouble communicating was in spelling and pronouncing the name of one of Barragan's contacts. Under the totality of the

---

[3] Again, this testimony is corroborated by Government Exhibit 1.

circumstances, I find that Barragan sufficiently understood his rights and waived them, even if English is not his primary language.

Barragan's argument that he did not know he could say 'no' when asked if he understood his rights also fails. A waiver of *Miranda* rights is knowing and intelligent where it is made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Gayekpar*, 678 F.3d 629, 638 (8th Cir. 2012) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A waiver of *Miranda* rights may be either express or implied. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2261-62 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."). "[A] valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affect[t] his decision to confess." *Colorado v. Spring*, 479 U.S. 564, 576 (1987).

Barragan did not need to be informed that he could say "yes" or "no" because the question Clausen asked him was whether he *understood* his rights. Barragan's choices of response were apparent and Barragan responded by nodding his head. Clausen said "I need a 'yes,' yes?" to indicate that he needed a verbal response for purposes of the recording. Barragan had already indicated he understood by nodding his head before Clausen asked for a "yes." This was also the second time Barragan had been read his rights that day, a fact Barragan acknowledged at the police station. To the extent Barragan is arguing he did not know he was waiving his rights (which is not clearly established by his motion), the outcome would remain the same. *See Thompkins*, 130 S. Ct. at 2262 ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."). Barragan's conduct is sufficient to indicate that he understood his rights and waived them by answering the officers' questions.

Throughout his communications with Howard and Clausen, Barragan was assertive and able to track questions and respond in a way that indicated he understood. When he was read his *Miranda* rights a second time and asked if he understood, Barragan clearly responded that he did before he proceeded to answer questions. The government has established by a preponderance of the evidence that Barragan's waiver of his *Miranda* rights was voluntary, knowing and intelligent.

## *Conclusion*

For the foregoing reasons, I find that evidence obtained from the search of Barragan's hotel room and from his post-*Miranda* interview should not be suppressed and therefore RESPECTFULLY RECOMMEND that Barragan's motion to suppress (Doc. No. 17) be **denied**. Objections to this Report and Recommendation must be filed by **September 10, 2013**. Responses to objections must be filed by **September 24, 2013**.

**IT IS SO ORDERED.**

**DATED** this 27th day of August, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE